IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LORIEL H.,

                    Plaintiff,                                8:21-CV-196

vs.

                                                             MEMORANDUM AND ORDER

KILOLO KIJAKAZI, Acting
Commissioner of the Social Security
Administration,

                    Defendant.

The plaintiff, Loriel H., filed her complaint (filing 3) seeking judicial review from the Acting Commissioner's denial of her application for Title II disability insurance benefits, and moved this Court for an order reversing the Acting Commissioner's final decision. Filing 22. The Acting Commissioner filed her motion to affirm the agency's final decision denying benefits. Filing 24. The Court finds that the Acting Commissioner's decision is not supported by substantial evidence on the record, that the plaintiff's motion to reverse should be granted, and that the Acting Commissioner's motion to affirm should be denied.

## I. FACTUAL BACKGROUND
## 1. MEDICAL AND WORK HISTORY

The plaintiff is a resident of Bellevue, Nebraska. She is married, and has custody of her son who was born into her previous marriage. Her husband shares custody of his two daughters with their mother. Filing 17-2 at 42. The plaintiff was in the Army and Army Reserves from 2008 to February 2019. Filing 17-2 at 43. She entered active duty on June 20, 2013, and was deployed

to and served in Afghanistan. She was released from active duty on June 19, 2014. Filing 17-5 at 9, filing 17-2 at 43. After returning from Afghanistan, and until her last day of service in 2019, the plaintiff worked for the Veterans Administration (VA), primarily as a purchasing agent for prosthetics. During the last two years of her service, she was the lead purchasing agent for prosthetics. Filing 17-6 at 32. The plaintiff's military service ended with medical retirement, and in a determination dated August 4, 2020, she was found to have a 100 percent service-connected disability. Filing 17-5 at 6-8. The effective date when she became totally and permanently disabled due to her service-connected disability was deemed to be September 10, 2018. Filing 17-5 at 9.

On January 25, 2019, the plaintiff filed her first Title II application for a period of disability and disability insurance benefits, claiming that her period of disability commenced on September 30, 2018. Filing 17-3 at 5. Her application was initially denied on March 28, 2019, and denied on reconsideration on May 22, 2019. The plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on October 28, 2019. The plaintiff received notice of an unfavorable decision in a letter dated November 13, 2019. Filing 17-3 at 2.

On April 3, 2020, the plaintiff filed her second Title II application for a period of disability and disability insurance benefits, this time claiming an onset date of November 14, 2019—the day after the date the unfavorable decision notice for her first disability application. Filing 17-2 at 16. The plaintiff's second application was initially denied on July 17, 2020, and denied on reconsideration on August 25, 2020. The plaintiff requested a hearing, which was held on December 1, 2020. The plaintiff was issued notice of an unfavorable decision regarding her second application in a letter dated

2

December 17, 2020. Filing 17-2 at 12. The plaintiff filed a request for review with the Appeals Council on February 4, 2021. Filing 17-4 at 76-78. The Appeals Council denied her request on March 31, 2021. Filing 17-2 at 2-6.

The plaintiff's appeal here is focused on her mental health impairments and resulting disability. Filing 17-2 at 41. As such, the Court's review and analysis of the medical records in this, the plaintiff's second application for benefits, will be focused on the treatment she received from her psychiatrist, Dr. Rebecca Schmidt, M.D., and her therapist, Scarlett Shockley, LMHP, from June 2018 to October 2020. Dr. Schmidt provided services through the VA. She saw the plaintiff on June 29, 2018, for management of the medications she was taking for depression and post-traumatic stress disorder (PTSD), as well as for supportive psychotherapy. Filing 18-2 at 10. Dr. Schmidt noted that the plaintiff expressed that she was doing okay, but was stressed about her job, her son's special needs, and her stepdaughters. Because the plaintiff was having difficulties with maintaining a good mood, Dr. Schmidt began a trial of duloxetine and continued the plaintiff's psychotherapy services at the Vet Center. Filing 18-2 at 11.

In January 2017, the plaintiff took an overdose of her hypertension medication, and was hospitalized in a psychiatric intensive care unit (PICU) for an attempted suicide. For a period of time after her release from the PICU, the plaintiff was deemed to be at a high risk for suicide, and a VA suicide prevention case manager would regularly contact the plaintiff to check on her wellbeing. In a telephone assessment note dated August 20, 2018, a case manager recorded that the plaintiff stated that her mood had not been great lately, and that she had been pretty suicidal. The plaintiff reported engaging in some preparatory behaviors, and that she had thoughts of suicide, but was

afraid to follow through for fear of failing and making life more complicated. Filing 18-2 at 3.

On October 9, 2018, the plaintiff's husband called the VA mental health triage line and requested a return call from Dr. Schmidt. He reported that the plaintiff was having a very difficult time since going through the medical board process and having to rehash every stressful occurrence in her life. Filing 18-1 at 221. When Dr. Schmidt returned the call, the plaintiff was crying so much that Dr. Schmidt had considerable difficulty having a conversation with her, and asked the plaintiff's husband to bring her into the clinic, which he did. Dr. Schmidt's treatment note for that visit reported that the plaintiff was having significant symptoms of PTSD with nightmares, flashbacks, and dissociations, which resulted from her two-day compensation and pension evaluation, and from the coverage of the Brett Kavanaugh confirmation hearing. Filing 18-1 at 216. The plaintiff reported having been sexually assaulted when she was a high school sophomore, and twice while in the military by two different perpetrators, which is why the Kavanaugh hearing led to the plaintiff's symptoms. Filing 18-3 at 45.

The plaintiff told Dr. Schmidt that her depression was worse, and that she had thoughts of suicide without making plans or having an intent to act on a plan. Filing 18-1 at 216. Dr. Schmidt reported that the plaintiff's mood was depressed, and her affect was exaggerated. She ordered an increase in her lorazepam dose to address the plaintiff's anxiety, and began a trial of trazodone for insomnia. Filing 18-1 at 217. Dr. Schmidt also approved the plaintiff's request for family medical leave from her VA job for October 9 to October 12.

The plaintiff saw Dr. Schmidt again on October 26, 2018. The plaintiff described having two panic attacks at work since her return to work on October 15. Filing 18-1 at 211. She told Dr. Schmidt about having to shoot and kill a

4

young teen in Afghanistan who was attempting to enter her base and plant a bomb. She described carrying tremendous guilt for having to kill such a young man. *Id*. Dr. Schmidt assessed the plaintiff's mood as anxious, and her affect as exaggerated. She also reported that the plaintiff was somewhat reluctant to engage in therapy at this time. Filing 18-1 at 212.

The plaintiff returned to see Dr. Schmidt on November 9, 2018. Filing 18-1 at 206. Dr. Schmidt reported that the plaintiff's mood and anxiety were better with the use of lorazepam, but that she was having difficulty being compliant with her anti-hypertensive medications. Dr. Schmidt noted that the plaintiff's mood was neutral, and her affect was appropriate/variable. On December 3, Dr. Schmidt called the plaintiff to discuss her participation in a dialectical behavior therapy (DBT)[1] program, to which the plaintiff agreed. On December 13, a VA suicide prevention caseworker contacted the plaintiff for a 90-day follow up. Filing 18-1 at 202. The plaintiff reported that things were going okay, and that she was excited to start the new DBT program. Filing 18-1 at 203.

On December 27, 2018, the plaintiff was at work when she texted her husband that she had done something bad. Filing 18-1 at 180. She had opened a new bottle of lorazepam and her text included a photo of pills scattered on her desk. The plaintiff's husband believed that she had overdosed on her medication, contacted her boss, and had him take her to the VA emergency room. *Id*. As it turned out, the plaintiff's husband may have misunderstood the texts and jumped to the wrong conclusion, or perhaps the plaintiff's actions

---

[1] Dialectical behavioral therapy is a type of cognitive behavioral therapy, the goal of which is to identify and change negative thinking patterns and push for positive behavioral changes. DBT may be used to treat suicidal and other self-destructive behaviors. https://www.webmd.com/mental-health/dialectical-behavioral-therapy.

were a gesture and not a suicide attempt. In any event, the plaintiff had only taken three pills. Nonetheless, given her history, the VA physician took the matter seriously and had her admitted to the PICU. Filing 18-1 at 180-83. An assessment done on admission reported that the plaintiff was crying, feeling helpless, hopeless, depressed, anxious, and with suicidal thoughts. She denied any auditory or visual hallucinations. Filing 18-1 at 176. On December 28, the plaintiff was released from the PICU for outpatient care with Dr. Schmidt. Filing 18-1 at 166-67.

The plaintiff saw Dr. Schmidt again on December 31, 2018. Filing 18-1 at 150. The plaintiff's purpose for this visit was to obtain Dr. Schmidt's approval for her to take family medical leave. Dr. Schmidt described the plaintiff's mood as depressed, and her affect as constricted. Dr. Schmidt commented that the plaintiff was stable with current psychotropic medications, but needed time off of work to stabilize suicidal thoughts and start her DBT program. Filing 18-1 at 151.

The plaintiff completed a mental health assessment with Heartland Family Service on January 8, 2019, in order to start her participation in a program of individual outpatient therapy and group DBT counseling. Filing 17-7 at 3-19. The plaintiff began attending Heartland Family Service's group counseling on January 14, and began seeing an individual therapist on January 31. Filing 17-7 at 21. The assessment that the plaintiff completed to start therapy documented that the plaintiff was currently on family medical leave from her VA job, and that she didn't want to go back, stating, "I am not saying the VA makes me want to kill myself, but [it] really does." Filing 17-7 at 6. Also documented in the assessment was the plaintiff's description of her first suicide attempt in January 2017. Filing 17-7 at 13. She reported overdosing on medication while at home alone with her son. Her brother came

by and found her. She spent three days in a hospital, and five days at the VA recovering. A VA suicide prevention caseworker contacted the plaintiff on February 15, 2019. Filing 18-1 at 134. The plaintiff reported that she was participating in group DBT on a weekly basis, as well as individual therapy.

The Heartland Family Service discharge summary documented that the plaintiff was consistent with attendance until March 11, 2019, when she decided to stop coming to DBT group sessions. Filing 17-7 at 21. The plaintiff returned to counseling and DBT group sessions on March 26 after her doctor told her that she would not prescribe anxiety medications for her if she were not attending DBT group sessions. On March 18, the plaintiff left a voicemail message for Dr. Schmidt apologizing for missing her appointment. Filing 18-1 at 119. She explained that the recent flood had resulted in water in her basement, which she was dealing with, and that she was busy helping others who lived nearby and had lost their homes. The plaintiff said that helping others had given her a sense of purpose, which made her feel much better. On March 26, a VA suicide prevention caseworker contacted the plaintiff again. Filing 18-1 at 118. The plaintiff reported having good days and bad days, and tends to experience thoughts of suicide only on the bad days. The plaintiff and the caseworker agreed that the plaintiff's suicide high risk red flag designation could be removed.

The plaintiff's next appointment with Dr. Schmidt was on April 11, 2019. Filing 18-1 at 100. She was seen for medication management for depression, PTSD, and Borderline Personality Disorder. The plaintiff reported that her mood had been up and down, that nightmares had been more frequent, and that she has had an increased number of panic attacks and suicide ideations. Apparently referring to events in March, the plaintiff and Dr. Schmidt talked about the plaintiff discontinuing all of her medications, and quitting DBT

group sessions, and how Dr. Schmidt had her start taking her medications again, as well as started her on a trial of hydroxyzine for anxiety, and encouraged her to return to group DBT. Filing 18-1 at 101.

On May 9, 2019, the plaintiff called Dr. Schmidt's office in a panic because DBT services may be discontinued due to a change in how the VA contracts for services. Filing 18-1 at 77. The plaintiff returned a call to the VA National Suicide Prevention Hotline on May 22, upset because DBT service had abruptly ended. Filing 18-1 at 64-66. The caseworker reported that the plaintiff said she had not left her bed for over two and a half days. The plaintiff also told the caseworker that she felt suicidal but had no intention to act on her feelings. The caseworker encouraged the plaintiff to get out of bed, shower, and have something to eat in an attempt to feel better.

The plaintiff's counseling relationship with Heartland Family Service came to an end on May 29, 2019, due to a change in her VA insurance coverage. Filing 17-7 at 21. The discharge summary reported that the plaintiff was instructed on DBT skills, but she struggled with consistent attendance. The recommendation at discharge was for the plaintiff to continue with outpatient treatment, DBT group, and medication management in the future, even though the plaintiff had been able to decrease her levels of intensity, duration and frequency of her anxiety, depression, and suicidal ideations during treatment.

On May 30, 2019, the plaintiff became extremely distraught when she rubbed her belly button and a scab still attached to a suture from a laparoscopic surgery procedure performed on May 8 came off. Filing 18-1 at 57. She was told to put a band aid over it and call back if anything changes. On Tuesday, June 11, the plaintiff called into Dr. Schmidt's office in a panic because the DBT group she was referred to by the VA was not taking any VA patients.

Filing 18-1 at 42. After calming her, Dr. Schmidt asked the plaintiff to come into the office on Friday to review her situation. The next day, the plaintiff called in again, upset because the new place where she was sent for DBT services didn't even know what DBT services were. Filing 18-1 at 41. After calming her again, Dr. Schmidt instructed the plaintiff to contact her patient advocate, and that she would order another consult for DBT services.

The plaintiff saw Dr. Schmidt on Friday, June 14, 2019, for medication management and supportive psychotherapy. Filing 18-1 at 36. Her mood was described as neutral, her affect was appropriate/variable, but ongoing suicidal ideations persisted. Dr. Schmidt reported that the plaintiff was still very disappointed that she could not continue DBT at the same clinic as before. Filing 18-1 at 37.

The plaintiff's first visit with her new DBT therapist, Scarlett Shockley, was on June 27, 2019. Shockley noted on the intake form that the plaintiff experienced anhedonia, anxiety all the time, anger, racing thoughts, and nightmares about Afghanistan. Filing 18-3 at 44. She had thoughts of suicide four out of five days, and that she had been sexually assaulted three times— once when she was in high school, and twice while in the Army. Filing 18-3 at 44-45. Shockley observed the plaintiff's attitude to be guarded and her mood was anxious, but her affect was appropriate. Shockley also noted that the plaintiff had a panic attack when she talked about her disability.

The plaintiff's next visit with a mental health provider was on July 22, 2019, when she returned to see Dr. Schmidt. Filing 18-1 at 29. Dr. Schmidt noted that the plaintiff struggled daily to maintain mood, and often experienced suicidal ideations. The plaintiff's mood was described as depressed, and her affect was constricted. Dr. Schmidt encouraged the plaintiff to interact more with her therapist. Filing 18-1 at 30. On July 25, the plaintiff

returned to see Shockley, who noted that the plaintiff was stressed out about her Social Security hearing set for October 2019, and was still stressed about what she went through with the medical board interviews back in October 2018. Filing 18-3 at 43. Shockley reported that the plaintiff's judgment and insight were minimally impaired.

The plaintiff's next appointment with Shockley was August 11, 2019. Filing 18-3 at 42. She reported having financial stress about having to repay a wage overpayment. The plaintiff's husband was also present, and was asked about the plaintiff dissociating. His answer was that she does it all the time. The plaintiff saw Dr. Schmidt for a medication management check and supportive psychotherapy on August 19. Filing 18-1 at 24. The plaintiff told Dr. Schmidt that her mood had been up and down, and that she had suicidal thoughts at least two to three times a week, but had not acted on them. She also told Dr. Schmidt that she had been trying to diminish her tendency to dissociate by using techniques to ground herself—focusing on the here and now. Dr. Schmidt observed her mood to be neutral, and her affect to be constricted. Filing 18-1 at 25.

The plaintiff next saw Shockley on August 29, 2019. Filing 18-3 at 39. At this session, the plaintiff's previous DBT learning was reviewed, and she admitted that she has put "her wall back up and doesn't want to do therapy." When she saw Shockley again on September 5, the plaintiff said she tended to be sad this time of year, and shared stories about seeing someone hurt by a rocket—an image she continued to see daily. She also described seeing a helicopter shot down, and that the bodies of the six individuals who died could not be shipped home because of the government shutdown. Filing 18-3 at 38. The plaintiff said she "sees all of that" when she dissociates. The plaintiff's next session with Shockley was on September 12. Filing 18-3 at 36. Shockley

reported that the plaintiff came in very tearful and anxious, and began sobbing. She had nightmares about suicide the prior night, in which she felt relief. Shockley noted that the plaintiff was trying very hard not to cry, and at one point appeared to tell herself "reel it in." The plaintiff acknowledged that she has "conversations in my mind."

The plaintiff returned to Dr. Schmidt on September 24, 2019. Filing 18-1 at 2. She said that her therapist, Shockley, wanted her to start a trial of prazosin for nightmares, which Dr. Schmidt said she would order. Dr. Schmidt noted that the plaintiff was reporting that her sleep was disturbed nightly by nightmares. The plaintiff's mood was observed to be neutral, and her affect was constricted. On October 10, the plaintiff saw Shockley, who reported that her depression has been very bad, and that she was isolating and not showering. Filing 18-3 at 33. She saw Shockley again on October 17, and reported being very down, having very intense suicide thoughts, and that her sleep had been poor. Filing 18-3 at 32. The plaintiff said she had a panic attack that morning, and Shockley observed that the plaintiff dissociated throughout their conversation.

The plaintiff brought her DBT diary cards to this session for Shockley to review. The cards documented the plaintiff's thoughts and emotions between October 10 and October 16. Filing 18-3 at 35. The diary entries show the plaintiff expressing suicide ideations with plans, anger, embarrassment at who she has become, racing thoughts, anxiety about her life, and being depressed about what she sees as a life without hope. Filing 18-3 at 35.

The plaintiff's next visit with Dr. Schmidt for medication management and supportive psychotherapy was on October 22, 2019. Filing 17-8 at 182. She reported that her mood was down, possibly because of her upcoming Social Security hearing. She also said she was having a difficult time with Shockley

because of a considerable degree of tension. Dr. Schmidt ordered a trial of prazosin for nightmares (which she thought she had ordered before, but apparently forgot to do), and ordered DBT therapy from a different provider if allowed by the VA. The plaintiff's next visit with Shockley was October 31. Filing 18-3 at 31. She reported that she was "super f**king depressed." The plaintiff said she had her Social Security hearing on Monday (October 28), and that she dissociated through half of it, which she called embarrassing. Shockley noted that she was not taking care of her activities of daily living.

On November 8, 2019, the plaintiff presented at the VA emergency department with complaints of left ear pain, frequent headaches, dizziness, and blurriness in her left eye. Filing 17-8 at 171. Those conditions were evaluated, and treatment was ordered, but in addition, the plaintiff was referred for a suicide prevention risk assessment screening. Filing 17-8 at 168. The screening instrument that was administered rated the plaintiff as having severe depression. The plaintiff admitted that she had daily suicide thoughts but lacked intent because her therapy was working. She also reported that her most severe suicide ideation was approximately two weeks ago when she was overwhelmed by her Social Security hearing.

At her November 18, 2019, session, the plaintiff told Shockley about her trip to the emergency room and that while there she had to have a full psychiatric evaluation. Filing 18-3 at 30. She reported that her dreams about Afghanistan had decreased, but had been replaced with "crazy dreams." She also reported that her anxiety was up, and that she didn't feel safe in her neighborhood. Shockley observed the plaintiff's judgment and insight to be moderately impaired. The plaintiff saw Dr. Schmidt on November 22, and reported that her mood was a bit more stable, and that she was not so depressed after talking with her attorney about the denial of her Social

12

Security appeal. Filing 17-8 at 154. She was, however, concerned about meeting all of her family's financial needs. The plaintiff was to start group DBT services with a provider other than Shockley next week. [2]

The plaintiff's next appointment with Shockley was on November 25, 2019. Filing 18-3 at 29. The plaintiff reported that she was "a hot f**king mess" when speaking to her attorney about the denial of her Social Security disability appeal. She told Shockley that since she has been on prazosin, she's had bizarre, unsettling dreams about homicides or homicide/suicides. For the first time, the plaintiff told Shockley about talking to the "shadows" and how they respond to her—sometimes saying negative things about her and sometimes positive things. Shockley reported seeing the plaintiff have what Shockley believed was a conversation with a shadow while in her office. The conversation was in the plaintiff's head, and it was supposedly about Shockley thinking that the plaintiff was crazy. The plaintiff said she had not told Dr. Schmidt about talking to the shadows. Shockley encouraged the plaintiff to have that conversation.

At her next visit with Shockley on December 12, 2019, the plaintiff reported that the "shadow people" had been bothering her even more, and that they were mad because she was on prazosin. Filing 18-3 at 28. The plaintiff reported that she had a conversation with the shadow people about wanting to do a mass bombing. Shockley reported that the plaintiff said, "I know it is ridiculous that I talk to shadow people." Shockley took it upon herself to call Dr. Schmidt's office and alert her to the plaintiff's conversations with shadow people, and that the shadow people talk to her about mass bombings. Filing

---

[2] The plaintiff's individual sessions with Shockley did not end at this time. The record is silent about any group DBT sessions with Shockley or any other therapist after the VA's contract with Heartland Family Service ended in May 2019.

17-8 at 139. Shockley also left word for Dr. Schmidt that the plaintiff "did have an incident in her office this week," presumably, this comment meant that Shockley believed she witnessed the plaintiff having a conversation, or at least an encounter, with the shadow people.

Dr. Schmidt saw the plaintiff on December 16, 2019, for her usual medication management and supportive psychotherapy session. Filing 17-8 at 134. The plaintiff reported that she had been doing better with less frequent nightmares, but now her nightmares had been replaced with weird dreams. The plaintiff acknowledged that she has been "hearing a set of voices" for a while that aren't really hallucinations, while the shadows started after her tour in Afghanistan. Dr. Schmidt estimated that it sounded like the plaintiff dissociated for 85 percent of a day. Further, Dr. Schmidt wrote that the plaintiff "made a concerted effort to note" that she knows the "hallucinations and shadows" aren't real and that she isn't crazy. The plaintiff told Dr. Schmidt that she and her family were going to Louisiana for Christmas to visit her husband's father who was rather ill. Dr. Schmidt's comments regarding this therapy session noted that the plaintiff was being more open about her dissociative experiences and was encouraged to stay in the here and now. She reassured the plaintiff that her symptoms were not those of a psychosis. Filing 17-8 at 135.

At her December 18, 2019, visit with Shockley, the plaintiff discussed her sister, who is schizophrenic. Filing 18-3 at 27. She also reported that the first time she talked to shadow people was while in Afghanistan, and that it was after a long day without eating and with minimal sleep. She said that the shadow people consist of two males and one female, and that they try to appear in her dreams. She also said that they are very angry that she is on the nightmare medication. At her next visit with Shockley on December 31, the

14

plaintiff told her about the trip to Louisiana, and how the mountains they drove through triggered some PTSD symptoms. Filing 18-3 at 26. She also told Shockley that she feels like she's doing better, and realizes that when she is less stressed, the shadow people and suicidal thoughts are much better. Shockley noted that the plaintiff said she was "ignoring the shadow people." When she next saw Shockley on January 7, 2020, the plaintiff said that the shadow people have been leaving her alone, but her anxiety is back, and she doesn't know why. Filing 18-3 at 25.

The plaintiff next saw Shockley on January 23, 2020. She reported that her car had been broken into, which triggered her PTSD symptoms. Filing 18-3 at 24. The police had woken her up at 3 a.m., and after that, she kept "clearing" her house every hour. Her next appointment with Shockley was January 29. Filing 18-3 at 23. She reported that to celebrate her birthday, she went out for dinner and dancing. She also said that she was trying to ignore the voices but "they're very loud." Shockley noted that the plaintiff's paranoia was pretty bad, and that she had been without sleep for three and a half days. Shockley called Dr. Schmidt to report that the plaintiff was experiencing increased auditory hallucinations and paranoia, as well as decreased sleep. Filing 17-8 at 124. Dr. Schmidt called the plaintiff, who told Schmidt that her increased symptoms were due to her car being broken into. The plaintiff also reported that she had lowered her trazodone dose from 150 mg taken at bedtime to 50 mg because at the higher dose, she slept for 20 hours. Dr. Schmidt addressed the plaintiff's sleep problems by adjusting her trazodone dose to 100 mg to be taken at bedtime. *Id.*

The plaintiff next saw Shockley on February 19, 2020. Filing 18-3 at 22. Shockley reported that the plaintiff said her mood was worse, and that she was easily agitated and fighting with her husband. Shockley also documented that

the plaintiff had a command voice hallucination, and a visual hallucination of a "fire man demon." Shockley called Dr. Schmidt to report the plaintiff's increased symptoms. Dr. Schmidt called the plaintiff in response to Shockley's concerns. Filing 17-8 at 120. The plaintiff told her that she stopped taking duloxetine because she was having difficulty swallowing the pills. Dr. Schmidt ordered a trial of aripiprazole.

On February 26, 2020, the plaintiff returned to see Shockley, who reported that the plaintiff had stopped taking her antidepressant because it was hard to swallow, and that she feared being abandoned by Dr. Schmidt. Filing 18-3 at 21. The plaintiff said that the voices have been negative and derogatory, except for the female voice which was nice and calm. Shockley noted that the plaintiff's husband thought she had been dissociating quite a bit, but that the plaintiff thought she was doing better. Shockley also noted that the plaintiff had not showered for four days. Shockley called Dr. Schmidt to report that the plaintiff had discontinued duloxetine, and that she was still hearing voices. Filing 17-8 at 115. Dr. Schmidt noted that she would address Shockley's concerns when she saw the plaintiff tomorrow.

At her February 27, 2020, visit, the plaintiff told Dr. Schmidt that she had really been working hard on her dialectical behavior therapy. Filing 17-8 at 111. She said that she had been dissociating occasionally, and that the prazosin has knocked out her nightmares. The plaintiff expressed concerns that she would be diagnosed with a psychotic disorder like her sister. Dr. Schmidt encouraged her to think of her symptoms of dissociating and "talking to a sleeper" as temporary signs of an illness that can be treated, while her sister will likely always have some degree of illness. Unlike the previous day when Shockley reported that the plaintiff had not showered for four days, Dr.

Schmidt observed that the plaintiff's grooming and hygiene were good, but that her mood was depressed, and her affect was constricted.

The records indicate that the plaintiff would not see Dr. Schmidt again until September. During this period, the plaintiff continued to participate in weekly therapy sessions with Shockley. On March 4, 2020, both the plaintiff and her husband saw Shockley, who noted that the plaintiff's husband said that the plaintiff dissociates all the time and talks to the shadow people. Filing 18-3 at 20. At her March 11 visit, the plaintiff told Shockley that the voices wouldn't let her sleep last night, and that she believed the voices are depressed, not her, but also said that she believed the voices make her depressed. The plaintiff also told Shockley at this session that one day this past week was very bad for suicide thoughts. Filing 18-3 at 19. On March 12, the plaintiff underwent a dental procedure, which was complicated by the plaintiff's poor dental hygiene. The dentist reported that the plaintiff was very anxious in the dental chair, and that she would not be able to tolerate a long appointment. Filing 17-8 at 108.

On March 18, 2020, Shockley reported that the plaintiff told her that the shadow people had not been as directive this week, and that the woman voice was neutral or boring, but the two men voices were very negative. Filing 18-3 at 18. Shockley noted that the plaintiff had started her Abilify (aripiprazole) trial two days ago. On March 25, Shockley reported that the plaintiff felt that her medications are helping with the voices and dissociations. Filing 18-3 at 17. However, at her next visit with Shockley on April 1, the plaintiff said that the two negative voices had started again on Friday (March 27), and they were upset with her because of the medications she was taking. Filing 18-3 at 16. Also, this April 1 visit was by way of a video link due to the COVID-19

pandemic, with the plaintiff in her home. These video appointments would be the new normal for Shockley and the plaintiff going forward.

At her next video appointment on April 8, 2020, the plaintiff reported that she had forgotten to take her medications for two days, and that her anxiety and paranoia were increasing to the point that she called Dr. Schmidt for an earlier appointment. Filing 18-3 at 15. She reported that while off her medications, the two negative voices were back, and she was afraid to go into the room where her medications were kept for fear of overdosing. She also reported calling the suicide hotline. Shockley noted that the plaintiff reported that she was struggling with one of her stepdaughters who had been staying with them. At her April 15 video session, Shockley reported that the plaintiff's husband thinks she is okay, that her mood is better, and that lately they had been playing video games together. Filing 18-3 at 14. The plaintiff, however, said that she is paranoid all the time, and that one day during the past week she thought a lot about death. Shockley noted that the plaintiff was only hearing the voices in whispers. Shockley also reported seeing that the plaintiff's hair was now dyed green.

On April 22, 2020, the plaintiff reported that a shadow voice was not playing nice since she has been on Abilify, and it drains her, making her feel like giving up. Filing 18-3 at 13. She also said that she was struggling and wants to overdose when she is around her medications. The plaintiff's husband reported that the plaintiff's anger and rage were decreased, but her paranoia and insecurity had increased. The plaintiff told Shockley at her next video session on April 29, that she was tired of disappointing Dr. Schmidt. Filing 18-3 at 12. Shockley reported that the plaintiff told her the two male voices had been very aggressive, and the plaintiff thought that they were fearful that they

18

were going away. The DBT goal that Shockley set for the plaintiff was for her to use "be aware of getting on the crazy train skills."

On May 6, 2020, the plaintiff reported that her nightmares had resumed the past three to four nights. Filing 18-3 at 11. Shockley also noted that the plaintiff reported that the voices were bad Saturday, but the "happy lady" came out and she spent most of the day dissociating and talking to her. In a telephone session on May 12, Shockley noted that the plaintiff's suicide and dissociation symptoms over the past week had increased, and that she had a panic attack on Thursday (May 7), but that the voices had not been around for the last couple days. Filing 18-3 at 10. Shockley also reported that the plaintiff had to stop taking prazosin because her blood pressure had dropped, and that now, her PTSD symptoms and nightmares had increased. In the video session on May 20, the plaintiff said she was taking prazosin again, and her nightmares are better, but her sleep was not good, waking up a couple times with an uneasy feeling. Filing 18-3 at 8. The plaintiff also said that the voices are still there, and want her to be depressed. Shockley observed that the plaintiff had showered, her hair was straightened, she was dressed, and that she had used makeup.

Shockley's next video session was on May 27, 2020. Filing 18-3 at 9. The plaintiff said she was dissociating more, and having conversations with one of the male voices. She said the voices try to talk her out of taking medication. She acknowledged that she knew she needed to get rid of the voices and relearn coping skills. Shockley noted that the plaintiff hadn't showered for three days, and wasn't changing her clothes. At the June 10 video session, the plaintiff told Shockley that there had been no voices for the past few days, and she felt lonely and abandoned. Filing 18-3 at 7. She also said that her nightmares were back

19

in full force, so she will start prazosin again. Shockley noted that the plaintiff had not been taking care of her activities of daily life for the past two days.

Shockley's session with the plaintiff on June 17, 2020, was by Zoom. The plaintiff said that one shadow person was back and that she was dissociating a lot. She reported that she "drank a sh*t ton last night," and requested to go to the hospital, which Shockley seemed to understand as a suicide ideation or gesture of some kind. Filing 18-3 at 103. At her June 24 video session, the plaintiff said that the negative male voice had been not so bad. She reported taking a shower today—her first in the last three days. Filing 18-3 at 102. On July 1, the plaintiff told Shockley that the voices, for the most part, had been quiet. However, fireworks were triggering PTSD symptoms. Filing 18-3 at 101. Fireworks were again identified as a PTSD symptom trigger in her July 8 video session. Filing 18-3 at 100. The plaintiff reported that her flashbacks were terrible. She told Shockley that the two male shadows were back, both as voices and visually. The reference in Shockley's note is unclear, but it appears that the plaintiff reported a homicide ideation of shooting up a building. Shockley also documented that the plaintiff's stress hives were spreading from her back to her sides.

Shockley reported reviewing the plaintiff's VA disability report with her on July 17, 2020. Filing 18-3 at 99. The report identified the plaintiff as having a 100 percent service-related disability, and that she would be permanently retired. Shockley observed that the plaintiff was defensive about the report until they discussed it thoroughly. The plaintiff reported that her sleep had been variable, that she didn't want to get out of bed, her showers had been spread out, and activities of daily living were difficult. She hadn't really been out of the house since the Fourth of July. Shockley noted that the plaintiff said

she was "building up" for a baby shower on August 1. Also, the shadow people were only there one day over the past week.

The progress note for Shockley's July 22, 2020, video session reported that the plaintiff had an upper respiratory tract infection, but was refusing to get a COVID test. The plaintiff reported that the shadow people had been quiet. Only one of the three was present. Filing 18-3 at 98. At her next video session on July 29, the plaintiff said her respiratory infection was much better. Filing 18-3 at 97. She said she wasn't dissociating as much, that the shadow people were "background noise," and that she was keeping the television on to keep the shadow people quiet. She also said she was staying up too late and getting only four to six hours of sleep. The plaintiff told Shockley that her Social Security disability application had been denied. They reviewed her military retirement paperwork again. The plaintiff said it was hard reading that she was essentially unfit for duty.

At her August 5, 2020, video session, the plaintiff reported that all three shadow people were back, that they didn't like Shockley, and they wanted the plaintiff to quit therapy. Filing 18-3 at 96. The plaintiff said that she was "borderlining all over" her husband, and that her knee pain was increasing her suicide thoughts. Shockley noted that she would talk to Dr. Schmidt about increasing the plaintiff's Abilify dosage. The plaintiff told Shockley at her August 12 video session that yesterday was a rough day. Filing 18-3 at 95. Her knee pain was bad, and she had thoughts of cutting or stabbing her knee to relieve pressure. Also, she reported seeing a shadow person emerge from the dark.

Shockley noted that at her August 26, 2020, video session, the plaintiff was irritable and answering most questions with "fine." Filing 18-3 at 10. The plaintiff said her medications were working and the voices were quiet. She

21

reported that she was going to North Carolina to support a friend. At her next video session on September 2, Shockley reported that the plaintiff didn't know how long it had been since she had showered, and that there was a fly infestation in her house. Filing 18-4 at 9. Shockley reported seeing hanging fly strips that were full of flies. The plaintiff reported that the shadow people were loud in her head, and that it had been a long time since it has been this loud. She said that they are telling her that therapy and Social Security disability are a waste of her time. The plaintiff reported not being able to sleep, that her memory was poor, and that she was frequently dissociating. Although unclear, Shockley's progress note may indicate that the plaintiff had missed several doses of medication.

The plaintiff told Shockley that her knee pain was much better at her September 9, 2020, video session. Filing 18-4 at 8. She also said that she hadn't seen or heard the shadow people since last week. Shockley reported that the plaintiff was still in her robe for the session, which began at 2:00 p.m., and that both the plaintiff and her husband were not taking care of their activities of daily living. Shockley noted that the plaintiff had not showered for a week.

The plaintiff had a telephone appointment with Dr. Schmidt for medication management and supportive psychotherapy on September 15, 2020. Filing 18-3 at 113. Dr. Schmidt reported that the plaintiff told her that aripiprazole (Abilify) has been the best medication she has ever been on in that her auditory hallucinations and delusions are practically gone, and her paranoia is considerably less. Dr. Schmidt found the plaintiff to be relatively stable with her current psychotropic medications, and her plan was to continue those medications, as well as her DBT services with Shockley. The plaintiff's next video session with Shockley was the next day, September 16. Filing 18-4 at 7. Shockley reported that the plaintiff was doing well overall, and that she

had showered three times in the past week. She told Shockley that she would be leaving on Monday (September 18) to go support her friend.

The plaintiff had a telephone session with Shockley on September 29, 2020. Filing 18-4 at 6. She talked about going to Ft. Bragg, North Carolina, so that she could provide emotional support for her friend who was going through a court custody hearing. The plaintiff said the shadow people got really loud while she was on her trip, and she dissociated a lot. Today, however, there was nothing. Shockley noted that the plaintiff had been taking better care of her activities of daily living lately, and has been consistently taking her medications. The plaintiff reported getting a new tattoo, and that she loved the intense pain.

On October 7, 2020, the plaintiff had a video session with Shockley. Filing 18-4 at 5. The plaintiff told Shockley that the shadow people were talking to her again. She also reported having two rage episodes and sleep disturbances. Shockley reported that the plaintiff expressed frustration with Dr. Schmidt, who purportedly told her that her symptoms were just depression. The plaintiff told Shockley that both of her parents are schizophrenics who met in a psychiatric hospital. Also, she said she didn't tell Dr. Schmidt about the shadow people earlier because she didn't want Schmidt to report it in her military medical records. Shockley's progress note appears to indicate that the plaintiff was dissociating and the shadow people were telling her not to listen to Shockley during their session.

At her next video session on October 14, 2020, Shockley reported that the plaintiff was very irritable and didn't feel like talking, telling Shockley that "everything is f**king wonderful." Filing 18-4 at 4. In her progress note for the plaintiff's video session on October 21, Shockley reported that the plaintiff has been a bit moody. Filing 18-4 at 3. The plaintiff's appearance was described as

disheveled. She told Shockley that the shadow people encourage her to stay angry about an issue she was having with how her husband treats her brother. Shockley documented that the plaintiff said, "I would love to die, but I'm not suicidal." At her October 26 video session, Shockley reported that the plaintiff was very anxious about her upcoming Social Security hearing. Filing 18-4 at 2. The plaintiff said that the shadow people have been very angry. She said, "they creep out of the closets in the most terrible ways," and that they can manipulate their faces and hands. Shockley indicated that the shadows were "saying things" to the plaintiff while Shockley was talking.

## 2. ADMINISTRATIVE HEARING

The administrative hearing on the plaintiff's claim was held on December 1, 2020. The same ALJ that heard the plaintiff's first appeal in 2019 presided. Filing 17-2 at 37. The hearing was conducted by way of a telephone conference with the ALJ, the plaintiff, her attorney, a vocational expert, and a Social Security Administration employee who set up the teleconference and made a digital audio recording of the hearing, all participating from separate locations. Filing 17-2 at 36-37.

The hearing began with the ALJ acknowledging that there was a hearing—"same case, same claimant"—which resulted in an unfavorable decision. Filing 17-2 at 37. The ALJ asked if the present hearing was a continuation of the previous hearing, or if this claim was based on some kind of change in circumstances. The plaintiff's counsel answered that this hearing was a continuation of the last hearing. The ALJ then asked if the plaintiff was married (she is), was she getting VA benefits (she was), and whether she's worked since the last hearing (she hasn't). In response to the plaintiff's counsel pointing out that the plaintiff is "one hundred percent VA disabled," the ALJ

stated that "the Social Security program is different than the veteran's program." Filing 17-2 at 38. Referring back, again, to the previous hearing, the ALJ identified what the plaintiff was deemed capable of doing, and the jobs that were deemed available for her to perform.

In addition to the administrative and disability records that the ALJ identified for admission into evidence, the plaintiff's counsel asked the ALJ to include certain wage information that she didn't see in the documents listed by the ALJ. Filing 17-2 at 39. When asked why she wanted the wage information included, counsel responded that these records show that the plaintiff has consistently missed more than three days of work per month every month throughout her last employment, which is evidence of consistency—or lack thereof—showing why she would not be able to maintain competitive employment.

Referring back to the previous hearing yet again, the ALJ recalled that the plaintiff had been missing appointments and not doing much, or a lot, of counseling, and asked if the plaintiff had made any improvements with her treatment. Filing 17-2 at 39. Counsel's response was that the record does show that the plaintiff is now getting very consistent treatment, but those same records show significant suicidal ideation, and that she experiences visual and auditory hallucinations which would take away from her ability to concentrate and maintain even entry-level work. Filing 17-2 at 40. The ALJ asked, "So primarily, you're emphasizing a mental health impairment?" Counsel replied, "Yes, absolutely."

The plaintiff was sworn, and after some preliminary background questions, the ALJ began asking about the plaintiff's current mental health treatment, specifically, whether Shockley was a better therapist for her. Filing 17-2 at 45. The plaintiff said she's been able to talk openly with Shockley, and

25

felt like she was on a better track, but still with some very bad spells and periods of good spells. Filing 17-2 at 45.

The ALJ inquired about what the plaintiff does. She said she has a driver's license but rarely drives. Filing 17-2 at 42. The ALJ asked if she liked to do "gaming" during the day. Filing 17-2 at 46. The plaintiff acknowledged playing "computer games" with her intellectually challenged ten-year old son, but was a little behind because it is hard for her to concentrate. When asked what she does for exercise, the plaintiff said she walks. When asked if she can do basic housework like cooking, cleaning, or laundry, she replied that on good days she can clean, but her husband typically fixes meals and cleans up. Filing 17-2 at 48.

In describing a bad day, the plaintiff said she'll wake up after a horrible night of sleep and just lie in bed for about three hours trying to muster up the motivation to get out of bed. When she does, she'll look at her house and get more depressed, start having conversations with a shadow she knows is not really there, and try to argue back thoughts of why she lives. Filing 17-2 at 47.

The ALJ asked about a reference in the records to the plaintiff drinking a ton last night. The plaintiff explained that she and her husband rarely drink, and that her father died from his alcoholism. She admitted that she caught herself drinking too much when she got back from Afghanistan, but quit, refusing to end up like her father. She thought that what she meant by that comment was that she had three drinks, which is a lot for her. Filing 17-2 at 48.

When the plaintiff's counsel was allowed to inquire, she asked the plaintiff what problems were keeping her from returning to work. The plaintiff said stress, the inability to work a full week, and the embarrassment of dissociating and hallucinating. When asked what she meant by dissociating,

the plaintiff said  it was having racing thoughts, typically about war, and that she has these thoughts every day. Filing 17-2 at 49. The plaintiff was also asked to describe her panic attacks. She said she has been having a lot of them this week, and they are never the same. Sometimes it is overwhelming anxiety crushing her, sometimes she'll cry, and sometimes she'll feel like she's going to vomit. Other times, she'll feel like her heart is going to explode. Filing 17-2 at 53. She said that typically, she will have panic attacks once per week on average. To calm herself, she tries to use her DBT skills, and do breathing exercises. She will also take anti-anxiety medication as needed. Filing 17-2 at 54.

Next, the ALJ turned to the vocational expert for his opinions. Filing 17-2 at 57. Although it is not entirely clear from the hearing transcript, it appears as though the ALJ, without objection, adopted her findings from the previous hearing regarding the plaintiff's inability to return to past work, and regarding the plaintiff's current residual functional capacity. The ALJ didn't ask the vocational expert about the plaintiff's past work, she just referred to her previous decision and proposed the following hypothetical for the vocational expert to base his opinions on: A younger person with a high school education; doing unskilled work with the capacity to lift 50 pounds, and lift 25 pounds frequently; should avoid concentrated exposure to vibration, fumes, odors, and hazards; capable of performing simple tasks; social interactions of not more than occasional with co-workers, supervisors, and the public. Filing 17-2 at 58-59.

The ALJ then asked the vocational expert whether there would be work for such person, and if so, to give her two examples of jobs in the light physical demand category, and two jobs in the medium physical demand category. Filing 17-2 at 59. The vocational expert identified the following jobs: (1)

27

Kitchen helper, DOT 318.687-010, unskilled, 2, medium position, 560,000 positions in the national economy; (2) Laundry room worker, DOT 361.684-014, unskilled, 2, medium position, 87,000 positions in the national economy; (3) Photocopy machine operator, DOT 207.685-014, unskilled, 2, light position, 48,000 positions in the national economy; and (4) Housekeeper, DOT 323.687-014, unskilled, 2, light position, 229,000 positions in the national economy. Filing 17-2 at 59. The ALJ asked if there was any discrepancy between his testimony and the *Dictionary of Occupational Titles* in terms of the jobs, exertion, or skill levels, and the vocational expert answered, no.

The plaintiff's counsel was then allowed to question the vocational expert. She asked him to consider the same hypothetical individual, but in addition, such person was also unable to concentrate and maintain attention for two hours at a time. Counsel then asked if that person would be able to perform the jobs he identified. Filing 17-2 at 60. The vocational expert said, in his professional opinion, but not based on the DOT, if such person is off task for ten percent of the day for whatever reason, they cannot do competitive work.

Counsel then asked him to consider the same hypothetical person, only this time the person would need someone to make sure they stayed on task with hourly checks. The vocational expert said if a person had to be redirected that much it would be an accommodation and not competitive employment. Finally, counsel asked the vocational expert to consider an individual that would miss more than three days a month, and would that person be able to maintain competitive employment. The vocational expert opined that in his professional opinion a person who misses two or more days a month on a consistent basis would not be capable of competitive employment.

### 3. ALJ's FINDINGS AND CONCLUSIONS

On March 31, 2021, the ALJ issued an unfavorable decision, finding that the plaintiff was not disabled. Filing 17-2 at 13. To determine whether a claimant qualifies for disability benefits, an ALJ performs a five-step sequential analysis of the claim. 20 C.F.R. § 404.1520(a)(4). Regarding step one, the ALJ found that the plaintiff met the insured status requirement of the Social Security Act through December 31, 2023, and that the plaintiff had not engaged in substantial gainful activity since November 14, 2019, the plaintiff's alleged onset date. Filing 17-2 at 18.

At step two, the medical severity of the claimant's impairment is considered. 20 C.F.R. § 404.1520(a)(4)(ii). The claimant has the burden to prove a medically determinable physical or mental impairment or combination of impairments that significantly limits the physical or mental ability to perform basic work activity. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). The ALJ found the following severe impairments: depression; anxiety; PTSD; borderline personality disorder; alcohol use disorder; migraines; patellofemoral disorder of the knees; asthma; and COPD. Filing 23-1. The ALJ found that the following conditions existed, but were not severe: obesity; acute respiratory infections; dental problems; tinnitus; hypertension; and GERD.

At step three, the medical severity of the claimant's impairments is considered. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments meet or equal a presumptively disabling impairment listed in the regulations, the analysis ends, and the claimant is automatically found disabled and entitled to benefits. *Gonzales*, 465 F.3d at 894. The ALJ found that the plaintiff's impairments, considered singly or in combination, did not meet or equal any specific listing. Filing 17-2 at 19.

29

Regarding the plaintiff's mental impairments, the ALJ concluded that whether considered singly or in combination, the severity of the plaintiff's mental impairments did not meet or medically equal the criteria of listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), and 12.15 (trauma and stressor related disorders).

In making this finding, the ALJ first considered whether the paragraph B criteria for the listings was satisfied, which required a finding that the plaintiff's mental impairments resulted in either one extreme limitation, or two marked limitations in a broad area of function. The specific categories of functioning for each listing are: (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist, or maintain pace; and (4) Adapt or manage oneself. Filing 17-2 at 19. The ALJ concluded that the plaintiff had no more than a mild limitation regarding her capacity to understand, remember, or apply information, and her capacity to adapt or manage herself, and no more than a moderate limitation regarding her capacity to interact with others, as well as to concentrate, persist, or maintain pace. Filing 17-2 at 20-21.

At step four, a claimant has the burden to prove the lack of a residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *Gonzales*, 465 F.3d at 894. The ALJ found that the plaintiff has the residual functional capacity to perform "medium work as defined in 20 CFR 404.1567(c) except she should avoid concentrated exposure to vibration, fumes, odors, and hazards. She is limited to simple and routine work tasks and can tolerate no more than occasional interactions with coworkers, supervisors, and the public." Filing 17-2 at 22. The referenced regulation defines medium

work as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."

The ALJ concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause some but not all of the alleged symptoms and severity." Further, the ALJ concluded that the plaintiff's statements concerning the intensity, persistence, and limiting effect of her symptoms "are not entirely consistent with the medical evidence and other evidence in the record." Filing 17-2 at 23. In support of her conclusions, the ALJ claimed that the plaintiff's statements regarding her symptoms were inconsistent with her daily activities, which the ALJ concluded were shopping for groceries, assisting with the parenting of three children who reside with her, preparing simple meals, doing household chores, reading, and playing video games. Id.

The ALJ concluded certain activities "appear well in excess of the severity of symptoms and extent of limitations" she alleged. Those "activities" included that the plaintiff could understand and consent to the various medical procedures she underwent, she was observed using a smart phone, traveling to North Carolina to support a friend, taking a trip to Louisiana with her husband to see her father-in-law, and that she "was going to participate" in a baby shower. Id.

The ALJ also found that the plaintiff's statements were "inconsistent with the type, dosage, and effectiveness of the medications" she was taking "to alleviate symptoms." Concerning inconsistent statements about her mental health, the ALJ concluded that the plaintiff reported doing better mentally and having less frequent nightmares in a treatment note from December 2019, and in a follow up note in February 2020. The ALJ concluded that in January 2020, the plaintiff's psychiatrist "noted that much of the claimant's sleep problem

was attributable [to] taking one-third of the prescribed dose of her insomnia medication." Id. Further, the ALJ attributed the plaintiff's reported "dissociating often" to "reportedly drinking to excess." Id.

Also in support, the ALJ noted that in September 2020, the plaintiff reported that one of her "psychiatric medications was the best medication she had ever used," and that her auditory hallucinations and delusions were practically gone, with considerably less paranoia and PTSD symptoms. Filing 17-2 at 24. Further, the ALJ found significant the report that one of the plaintiff's medications was discontinued because she couldn't swallow a capsule of its size.

The ALJ found that the plaintiff's testimony that her mental health had worsened since her onset date was inconsistent with the medical records, which, according to the ALJ, indicated that her "longitudinal treatment shows improvement with psychotherapy and the use of the skills she learned from her mental health counselor." Id. The ALJ concluded that in addition to the effectiveness of the plaintiff's medications, she was able to ignore her hallucinations and delusions, that she was "taking better care of her daily activities and doing overall well." Id. The ALJ thought that the plaintiff's therapist believed that plaintiff's "sleep problems" were due in part to poor sleep habits. The ALJ also found it important that the plaintiff generally maintained consistent attendance with treatment visits, "which is a notable improvement in comparison to past attendance." Id.

Finally, the ALJ concluded that the plaintiff's allegations of disabling symptoms are "unsupported by objective medical evidence." In reference to what the ALJ seemed to conclude constituted objective medical evidence regarding the plaintiff's psychiatric diagnosis, the ALJ reported that "exams showed limited abnormalities, most often noted as some mood disturbance,

grooming and hygiene deficits, and fair to minimally or moderately impaired insight and judgment. Otherwise, the claimant's sensorium, cognitive functioning, thought process, memory, facial expressions, motor behavior, punctuality, attitude, and eye contact were unremarkable or otherwise within normal limits." Id.

In considering the opinions of the medical professionals, the ALJ found the opinions of the non-examining state psychologists persuasive, but only partially so. The ALJ noted that these consultants concluded that the plaintiff's limitations with respect to concentration, persistence, maintaining pace, interacting with others, and adapting or managing herself were no more than moderate based on the record available for their review. Filing 17-2 at 25. However, the ALJ concluded that support for some of the limitations identified in their opinions was lacking in the "fully developed record available at the hearing level."

Specifically, the ALJ concluded that "the objective medical evidence and the claimant's daily activities" did not support the consultants' opinions that the plaintiff had moderate limitations in the area of adapting or managing herself, adapting appropriately to changes, being aware of normal hazards and taking appropriate precautions, and in setting realistic goals or making plans independently of others. Id. Additionally, the ALJ disagreed with the non-examining psychologists that there would be difficulty with the plaintiff's ability to maintain regular attendance. The ALJ noted that the plaintiff had maintained regular attendance with treatment, thus, in the ALJ's view, "there is no support for the conclusion that she would not be able to do the same in the course of full time competitive employment."

Finally, the ALJ found the opinions of the plaintiff's treating psychologist, Dr. Rebecca Schmidt, and the plaintiff's treating mental health

therapist, Scarlett Shockley, to be unpersuasive. The ALJ was critical of Dr. Schmidt's opinions of the plaintiff's functioning because it was "remarkably similar to the one she provided in June 2019," and that it endorsed "debilitating symptoms and extreme limitations that appear commensurate with an individual requiring a much greater level of psychiatric care than evidenced in the record." *Id.*

Further, the ALJ was critical of Dr. Schmidt's evaluation because it was "on a checkbox-style form provided by the claimant's representative," and it lacked support for her checkmarks. Filing 17-2 at 26. According to the ALJ, the "extreme limitations she endorses, such as expected work absences, simply lack any reasonable basis, as she would have no way of predicting such things within an acceptable degree of reliability." The ALJ also concluded that Dr. Schmidt's opinions of her patient were inconsistent with the "generally unremarkable observations and findings documented in her treatment notes as well as those of other providers." The ALJ found that the record medical evidence showed daily activities, effectiveness of medication, and "a relatively conservative treatment history that are grossly incompatible with the diminished level of functioning endorsed by Dr. Schmidt." *Id.*

The ALJ's conclusions regarding Shockley's opinions were much the same as her conclusions regarding Dr. Schmidt's opinions. The ALJ concluded that Shockley had no way to reliably predict many of the plaintiff's behaviors, including work-related attendance, and that Shockley's opinion regarding attendance was inconsistent with the fact that the plaintiff maintained regular attendance with her weekly appointments with Shockley. The ALJ found that Shockley's opinions that the plaintiff's concentration was poor and that she was easily distracted were inconsistent with "related observations and exam findings noted above." Further, the ALJ faulted Shockley because her opinions

34

were "obviously or expressly supported only by the claimant's subjective complaints."

The ALJ determined that the plaintiff was unable to perform her past relevant work as an accounting clerk, military supply sergeant, or purchasing agent. Filing 17-2 at 25. The ALJ found that the plaintiff's past relevant work was no less than skilled or semi-skilled jobs, and as such, exceeded her current assessed residual functional capacity, which limited her to jobs with only simple and routine tasks.

At step five, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform considering the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Gonzales*, 465 F.3d at 894. The ALJ accepted the vocational expert's testimony regarding jobs in the national economy that the plaintiff could perform given her age, education, work experience, and residual functional capacity. The ALJ included the following observation: "Although the vocational expert's testimony is inconsistent with the information contained in the *Dictionary of Occupational Titles*, there is a reasonable explanation for the discrepancy." According to the ALJ, the vocational expert said that regarding matters not addressed in the *Dictionary of Occupational Titles,* such as off task behavior and increased supervision, his testimony was based on his experience in job placement. Accordingly, the ALJ found that the plaintiff was not disabled.

On February 4, 2021, the plaintiff requested Appeals Council review of the ALJ's December 17, 2020, decision. Filing 17-4 at 76-79. On March 31, 2021, the Appeals Counsel notified the plaintiff that it had denied her request for review. Filing 17-2 at 2-7. The ALJ's December 17, 2020, decision is now the final administrative order.

## II. STANDARD OF REVIEW

This Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." *Combs v. Berryhill*, 878 F.3d 642, 645-46 (8th Cir. 2017). Substantial evidence is less than a preponderance, *id.*, but more than a mere scintilla, *Biestek v. Berryhill,* 139 S. Ct. 1148, 1154 (2019). "It means—and means only— such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The Court's review for substantial evidence is not one-sided. *Lawrence v. Saul*, 970 F.3d 989, 994 (8th Cir. 2020). The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." *Combs,* 878 F.3d at 645-46. Substantial evidence on the record is not synonymous with the less rigorous substantial evidence standard, and requires a more scrutinizing analysis of the evidence. *Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir. 1998). The only way a reviewing district court can determine if the record as a whole was taken into consideration is for the district court to evaluate in detail the evidence used in making a decision and how any contradictory evidence balances out. *Id.*

The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court defers to the ALJ's determinations regarding credibility so long as such determinations are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

### III. DISCUSSION

1. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE ALJ'S CONCLUSIONS
REGARDING THE PLAINTIFF'S SUBJECTIVE COMPLAINTS

Social Security Ruling 16-3p clarifies the factors that an adjudicator is to use in evaluating the intensity and persistence of a person's symptoms to determine the extent to which that person's ability to perform work-related activities is limited. Here, the relevant factors are: (1) The intensity, persistence, and functionally limiting effects of symptoms; (2) Objective medical evidence when evaluating symptoms; (3) Other evidence when evaluating symptoms; (4) The factors in 20 C.F.R. § 404.1529(c)(3); (4) The extent to which an individual's symptoms affect the ability to perform work-related activities or function independently, appropriately, and effectively; (5) Adjudication standards for evaluating symptoms in the sequential evaluation process. *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017).

The § 404.1529(c)(3) factors are: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of medication taken for symptoms; (5) treatment, other than medication, received for relief of symptoms; (6) measures the claimant has taken to relieve symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to symptoms. These factors are not new, but are similar to the factors in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), that have guided the analysis of whether a plaintiff's subjective complaints are consistent with the medical evidence. *Lawrence*, 970 F.3d at 995. Using the *Polaski* factors, a plaintiff's subjective complaints may be

discounted if there are inconsistencies in the evidence as a whole. *Bryant v. Colvin,* 861 F.3d 779, 782 (8th Cir. 2017).

The plaintiff argues that the ALJ, in reaching her conclusion that the plaintiff's statements about the intensity, persistence and limiting effects of her symptoms are not consistent with the medical and other evidence, inaccurately reported the plaintiff's testimony about her daily activities, failed to consider evidence showing employability deficits, and overstated the significance of evidence that the ALJ found in support of her conclusion. Filing 23 at 17-22. The Court agrees.

The ALJ reported that the plaintiff "shops for groceries, assists in the parenting of three children with whom she resides, prepares simple meals, performs some household chores, reads, and plays video games." Filing 17-2 at 23. This report is incomplete and inaccurate when considering the record as a whole.

The plaintiff's hearing testimony, and her answers found in her June 14, 2020, disability report, vary from the ALJ's findings. The plaintiff said that along with her husband, she'll only go to smaller grocery stores. Filing 17-2 at 51; filing 17-6 at 24. In big stores like Walmart, it's too crowded and there's a "bad line of sight." She also added that she absolutely has to go to the store with her husband, and never goes to the store alone. She also said that she is only able to follow a list with just three or four items on it. Filing 17-2 at 51. Further, she and her husband are full-time parents to her intellectually challenged ten-year-old son, but are only part-time parents to her husband's two daughters, as he shares custody of his daughters with their mother. Filing 17-2 at 42.

When the ALJ asked the plaintiff if she could do basic housework like cooking, cleaning, laundry, fix a meal, the plaintiff replied that on good days

she will clean. Filing 17-2 at 48. But by cleaning, she reported cleaning only the bathroom once a month, and it takes her two to three hours to accomplish this task. Filing 17-6 at 23. Further, the plaintiff reported that her husband typically fixes meals. Filing 17-2 at 48. She will, however, sporadically fix easy meals such as sandwiches or frozen dinners when she is okay to handle what she called a stressful task. Filing 17-6 at 23. The plaintiff did report that she reads, but that it takes her a long time to get through a book because she can't stay focused. Filing 17-6 at 25.

When the ALJ asked the plaintiff about her "gaming," the plaintiff corrected the ALJ's characterization that she played "video games," asserting instead that she said she played "computer games." The ALJ did not inquire further to understand the kinds of computer or video games that she played, or the difficulties involved in playing the games. The plaintiff also testified that in playing these games, she is behind her ten-year-old intellectually challenged son and husband because it's hard for her to concentrate. Filing 17-2 at 46.

Not included in the ALJ's description of the plaintiff's daily activities are matters that detract from a finding that the plaintiff is not disabled. For example, the plaintiff testified that although she has a driver's license, she rarely drives. Filing 17-2 at 42. She also reported rarely going outside, but on the occasions when she does go out on her own, she finds it horrifying. Filing 17-6 at 24. The plaintiff reported that she has lost friends, and that she doesn't want new ones. In her view, "isolation is best for someone like me." Filing 17-6 at 26. Also absent from the ALJ's description was the plaintiff's testimony regarding a bad day—waking up from a horrible night of sleep, assuming she even slept at all, lying in bed for hours without the motivation or willpower to get up, hallucinating and having conversations with shadows she knows are not real. Filing 17-2 at 47.

The ALJ concluded that the plaintiff's reports of certain activities and functioning exceed the severity of symptoms and limitations she alleges. Filing 17-2 at 23. The evidence that ALJ relied on in support, however, is not substantial, and does not provide good reasons for the ALJ's conclusion when the record as a whole is examined. The ALJ concluded that the plaintiff's capacity to understand and make decisions was greater than what the plaintiff alleged because she had no difficulty understanding and consenting to medical treatment, which included a surgical procedure. Id. The surgical procedure the ALJ referenced was likely a laparoscopic bilateral salpingectomy performed on May 8, 2019. Filing 17-8 at 15-20. The reason the plaintiff gave for wanting the procedure was because she did not want any more children. Filing 18-1 at 90. There is no indication whether the plaintiff's anxiety, depression, or paranoia was a factor, or even discussed, in connection with her decision to permanently end her ability to become pregnant again. Certainly, the ALJ did not pursue an inquiry before she reached a conclusion that the plaintiff's mental health diagnosis played no role in this twenty-eight-year-old woman's decision to give up the ability to have another child.

The ALJ also cited the plaintiff's September 2020 trip to North Carolina, her Christmas 2019 trip to Louisiana, and that she was going to participate in a baby shower, as evidence that the severity of the plaintiff's symptoms was not as she alleged. But these instances do not reflect substantial evidence in the record as a whole indicating that the plaintiff can function independently without experiencing an increase in her symptoms.

Specifically, the plaintiff's trip to Louisiana was not an independent vacation. It was a trip with her husband, her son, and her husband's two daughter, and they were going to Louisiana because her husband's father was rather ill. Filing 17-8 at 134. Also, during this trip the plaintiff was not

asymptomatic. She told Shockley that driving through the mountains triggered her PTSD symptoms and thoughts of Afghanistan. Filing 18-3 at 26. The trip to North Carolina also was not a vacation or pleasure trip, but was to emotionally support a friend in a custody matter. Filing 18-4 at 6-7. The plaintiff did, however, likely make this trip alone. Shockley's September 29 note indicated that the plaintiff's husband stayed behind cleaning out the clutter in their house. Filing 18-4 at 6. Shockley's note also reported that during this trip the plaintiff was not asymptomatic, with the plaintiff telling Shockley that the shadow people were really loud while she was away.

Further, the ALJ's report that the plaintiff was "going to participate" in a baby shower is not accurate. Filing 17-2 at 23. According to the medical records, on July 15, Shockley noted that the plaintiff reported that she really hadn't been out of her house since the Fourth of July, and that she was "building up" for a baby shower on August 1. First, the record is silent whether the plaintiff actually participated in a baby shower. Further, the plaintiff's belief that she had to "build up" for over two weeks just so that she could possibly attend what would normally be considered a benign or non-stressful event is not evidence that the plaintiff's symptoms are not as severe as she alleged.

The ALJ also found it consequential that the plaintiff "conversed with clinicians over the telephone and [was] observed using a smartphone, presumably to browse the internet, while in the clinical setting." Filing 17-2 at 23. Exactly how this behavior manifests evidence that the plaintiff's mental health symptoms are not as severe as she alleged was not explained. The plaintiff's claim isn't that she has low intelligence or that she is intellectually compromised. Her diagnoses are consistently reported as major depressive disorder, recurrent, moderate; PTSD, chronic; and borderline personality

disorder. *See, e.g.* Filing 18-3 at 114. There is nothing about the plaintiff's reported symptoms arising from these disorders that would implicate the use of a telephone, smartphone, or computer for video conferencing, which was the vehicle used by the plaintiff and Shockley for therapy due to the COVID-19 pandemic.

Substantial evidence and good reasons also do not support the ALJ's conclusions regarding the effectiveness of the mental health services the plaintiff has received. The ALJ concluded that "relatively conservative medical and psychiatric medication regimens" were generally effective in controlling the plaintiff's symptoms. Filing 17-2 at 23. The ALJ does not indicate the basis for her conclusion that the psychiatric care that the plaintiff has received can be fairly characterized as relatively conservative.

The record as a whole shows that the plaintiff participated in what were essentially weekly psychotherapy counseling sessions for the majority of 2019, and continuing through 2020. She was also seen by a treating psychiatrist for medication checks and psychotherapy counseling essentially every other month from June 2018 through February 2020. Also during this period, the plaintiff was usually taking four to five prescribed medications to address her symptoms of depression, anxiety, paranoia, sleeplessness, and nightmares. *See, e.g.*, filing 18-3 at 104. Further, the record as a whole indicates that during this same period the plaintiff was taking as many as sixteen different prescription medications to treat all of her conditions. *See,* filing 17-8 at 126. From January 2017 to March 2019, the plaintiff was considered a high-risk suicide patient by the VA and received suicide prevention services.

The record as a whole shows that since 2018, the plaintiff has required a very high level of medical care and services, primarily for her mental health conditions. It is significant that no medical professional in the record has

opined that the mental health services the plaintiff received were unnecessary or beyond what she required to treat her symptoms and conditions, or that she was malingering or exaggerating her symptoms. *See Nowling v. Colvin*, 813 F.3d 1110, 1117 (8th Cir. 2016). This level of necessary medical intervention and care cannot be fairly characterized as "relatively conservative."

The ALJ also opined that the plaintiff's "relatively conservative" psychiatric medication regime was "generally effective" in controlling or stabilizing her symptoms, with drowsiness as the only reported side effect. Filing 17-2 at 23-24. A Social Security proceeding is inquisitorial, not adversarial, and an ALJ is charged with developing the facts and has the duty to develop the arguments both for and against awarding benefits. *Biestek*, 139 S.Ct. at 1158. Here, the evidence the ALJ referenced in support of her conclusion consisted of isolated reports showing some level of symptom improvement from a lengthy and detailed longitudinal treatment record, but without regard for the plaintiff's reported condition following the treatment notes purportedly showing stabilization of the plaintiff's symptoms.

For example, the ALJ found that a December 2019 treatment note showed that the plaintiff claimed to be doing better mentally and having less frequent nightmares, and that this trend continued as evidenced by a similar report in a February 2020 follow-up visit with Dr. Schmidt. Filing 17-2 at 23. The record as a whole does not support the ALJ's conclusion regarding improvement in the plaintiff's condition up to December 2019, and does not support a conclusion that any such improvement was maintained through February 2020, and beyond.

The record as a whole shows that on September 12, 2019, the plaintiff came to her appointment with Shockley very tearful and anxious. She reported having a nightmare about suicide the prior night, in which she felt relief. Filing

43

18-3 at 36. When the plaintiff saw Dr. Schmidt on September 24, she told Dr. Schmidt that her sleep was disrupted nightly by nightmares. Filing 18-1 at 2. Dr. Schmidt was to start the plaintiff on a trial of prazosin to treat the plaintiff's nightmares, but for some unknown reason, the prescription wasn't ordered until after her next appointment with Dr. Schmidt on October 22. Filing 17-8 at 182.

The plaintiff had two sessions with Shockley between her appointments with Dr. Schmidt. On October 10, Shockley reported that the plaintiff's depression had been very bad, she was isolating and not showering. Filing 18-3 at 33. On October 17, Shockley reported that the plaintiff's mood has been very down and reactive, her sleep had been poor, and she was having suicide thoughts that were very intense. Filing 18-3 at 32. After the plaintiff started her prazosin trial, Shockley reported on November 18, that the plaintiff's dreams about Afghanistan (which were her nightmares) have decreased, but have been replaced by "crazy dreams." Filing 18-3 at 30. Shockley also reported that the plaintiff's anxiety had increased, and that she didn't feel safe in her neighborhood.

When she next saw Dr. Schmidt on November 22, the plaintiff reported that "her mood is a bit more stable and not so depressed since talking with her attorney"—not due to any medication or therapy. Filing 17-8 at 154. Dr. Schmidt noted that overall, the plaintiff's mood was "considerably better than earlier in the week." On November 25, however, the plaintiff reported that since she's been on prazosin, she's had bizarre, unsettling dreams about homicides or homicides/suicides. Filing 18-3 at 29. This occasion was also the first time that the plaintiff acknowledged talking to shadow people, and Shockley believed that the plaintiff was having a conversation with a shadow person while in her office. At her next visit with Shockley on December 12, the

plaintiff said that the shadow people were bothering her even more, and were mad because she was taking prazosin. Shockley also reported that the plaintiff had a conversation with the shadow people about doing a mass bombing. Filing 18-3 at 28.

The report the ALJ referenced regarding an improvement in the plaintiff's symptoms was presumably Dr. Schmidt's outpatient note dated December 16. Consistent with the ALJ's reference, Dr. Schmidt did note that the plaintiff stated that she had been doing better, and was having nightmares much less frequently. However, the ALJ omitted Dr. Schmidt's next comment—that the plaintiff's nightmares had been replaced by weird dreams. Filing 17-8 at 134. Further, the ALJ did not note Dr. Schmidt's report that the plaintiff acknowledged hearing "a set of voices," that she ends up being distracted from activities, and that it sounded like the plaintiff "dissociates up to 85% of a day."

When the full record of the effectiveness of the plaintiff's mental health treatment regime up to December 16, 2019, is viewed in context, it appears that prazosin did reduce the plaintiff's nightmares, but only to the extent that her nightmares about Afghanistan were now replaced by weird dreams, as well as unsettling dreams about homicides or homicides/suicides. Also, reports that the plaintiff was doing better must be considered in light of the symptoms she was manifesting in December, which included dissociating up to eighty-five percent of a day, talking to shadows, hearing voices, and the voices that she heard were, at times, talking to her about mass bombings. The plaintiff's medications may have been effective in making her better from where she was in September, but this is not evidence that the plaintiff's medications were "generally effective" in controlling her symptoms. To the extent that the plaintiff's symptoms were stabilized, they were stabilized at a level where her

symptoms could reasonably be expected to have a significant adverse impact on her participation in competitive labor.

The ALJ correctly acknowledged that Dr. Schmidt's patient record dated February 27, 2020, indicated that the plaintiff was doing better mentally, that she was dissociating occasionally, and that prazosin "is knocking out her nightmares." Filing 17-8 at 111. The ALJ did not acknowledge, however, that Dr. Schmidt also observed that the plaintiff's mood was depressed, that her affect was constricted, and that the plaintiff was "still somewhat symptomatic but is developing a number of DBT skills whereby she can avoid dissociation and maintain a better thought process." Filing 17-8 at 112.

Contrary to what the ALJ inferred, in the two months between her December 18 and February 27 appointments with Dr. Schmidt, the record as a whole does not reflect a steady improvement in the plaintiff's symptoms. Specifically, on December 18, the plaintiff told Shockley that the shadow people had been telling her negative things, and were very angry that she was on nightmare medication. Filing 18-3 at 27. But at her next visit on December 31, the plaintiff told Shockley that she was doing better and ignoring the shadow people. Filing 18-3 at 26. Although she believed she was doing better and ignoring the voices she heard, the plaintiff told Shockley that the drive to Louisiana to see her husband's family went through some mountains, which triggered her PTSD symptoms. On January 7, the plaintiff told Shockley that the shadows haven't been bothering her, but her anxiety was back, and she didn't know why. Filing 18-3 at 25.

But in her January 23 progress note, Shockley reported that the plaintiff's car had been broken into, which caused her to go about clearing her house every hour after the police told her about the break-in. Filing 18-3 at 24. From there, the plaintiff's condition only got worse. On January 29, Shockley

noted that the plaintiff's paranoia was pretty bad, and that although she was trying to ignore the voices, the plaintiff said that they are very loud. Filing 18-3 at 23. Shockley was, apparently, concerned enough to call Dr. Schmidt and report that the plaintiff was experiencing increased auditory hallucinations, paranoia, and decreased sleep. Filing 17-8 at 124.

On February 19, Shockley reported that the plaintiff's mood was even worse, that she was hearing command hallucination voices, and had a visual hallucination of a demon fire man. Filing 18-3 at 22. In her February 26 note, Shockley reported that the plaintiff was still hearing negative voices. Filing 18-3 at 21. The plaintiff told Shockley that she believed she was doing better, but her husband told Shockley that the plaintiff was dissociating quite a bit. Shockley noted that the plaintiff had not showered for four days. But the next day when she saw Dr. Schmidt, the plaintiff reported that she was working hard on her DBT, that she was only occasionally dissociating, and that prazosin had knocked out her nightmares. Filing 17-8 at 111.

This pattern, where the plaintiff experienced periods of dissociation, visual and auditory hallucinations, and suicide thoughts only to later report that she was hearing the voices less and less, would repeat itself for the remainder of 2020. No doubt that the plaintiff's medication regime helped with her symptoms, but the record as a whole does not support a conclusion that the plaintiff's symptoms were generally controlled or stabilized, or even trending downward. Instead, the plaintiff's symptoms would wax and wane, often depending on the level of stress that she felt she was experiencing.

It is improper for an ALJ to accord great weight to statements in treatment notes indicating an improvement in a claimant's condition without acknowledging that the claimant's symptoms waxed and waned throughout the substantial period of treatment, and without acknowledging the

47

unpredictable and sporadic nature of the claimant's symptoms. *Nowling*, 813 F.3d at 1123. Importantly, Dr. Schmidt's observation that the plaintiff was doing better, even though true at some level, has no necessary relation to the plaintiff's ability to engage in competitive employment. *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001).

Other evidence in the record that the ALJ cited for support of her conclusion that the plaintiff's medication was effective included a treatment note from January 2020, where the ALJ reported that Dr. Schmidt attributed much of the plaintiff's sleep problem to only taking one-third of the prescribed dose of her insomnia medication. Filing 17-2 at 23. The record actually shows that on January 29, after receiving a phone call from Shockley alerting her to an increase in the plaintiff's symptoms, Dr. Schmidt called the plaintiff, who told Dr. Schmidt that most of her problem has been sleeping. Filing 17-8 at 124. Her trazodone prescription called for her to take 150 mg at bedtime, but doing so caused the plaintiff to sleep for twenty hours. The plaintiff reduced her dosage to 50 mg so she wouldn't sleep as much, but now was having insomnia symptoms. Dr. Schmidt told her to take 100 mg at bedtime, and to call in a week or less to let her know how she was doing.

Further, the record as a whole shows that like her other symptoms, the plaintiff's insomnia would also wax and wane, notwithstanding her prescription medication regime. On March 11, 2020, the plaintiff reported only sleeping three to four hours. Filing 18-3 at 19. Then, on May 6, she reported that her sleep and sleep schedule were good. Filing 18-3 at 11. But at her very next session with Shockley on May 12, the plaintiff reported that she had a panic attack on Thursday and only slept for three hours with increased nightmares. Filing 18-3 at 10. At her session with Shockley on May 20, the plaintiff said her nightmares were better, but "sleep is sh*t." Filing 18-3 at 8.

This pattern would continue, with the plaintiff reporting insomnia or nightmare symptoms on June 10, filing 18-3 at 7, July 17, filing 18-3 at 99, and September 2, filing 18-4 at 9, but on most occasions, Shockley did not note that the plaintiff reported experiencing insomnia or nightmares symptoms, which suggests that the plaintiff was not having insomnia issues on these occasions.

The ALJ concluded (without citation to the medical record or evidence) that the plaintiff's reports of dissociating often were in the context of "reportedly drinking to excess." Filing 17-2 at 23. There is no support in the record for the ALJ's conclusion whatsoever. First, the plaintiff's mental health providers, Dr. Schmidt and Shockley, repeatedly documented the plaintiff's reports of dissociating. The plaintiff's husband also reported that she was dissociating, and the providers themselves reported observing the plaintiff to be dissociating. The plaintiff's dissociating was not limited to one occasion when she was "reportedly drinking to excess" as the ALJ concluded. In fact, there are very few occasions where Shockley or Dr. Schmidt failed to document that the plaintiff was, or had been, dissociating, either during a therapy session, or in the interval between therapy sessions.

On the other hand, there is only one reference in the entire record concerning the plaintiff's use of alcohol during the relevant period. At the hearing, the ALJ asked the plaintiff about a treatment note dated June 17 in which she purportedly said that she had been drinking a lot. Filing 17-2 at 48. The plaintiff explained that drinking a lot to her was having three drinks. She said that she and her husband rarely drink, and that her father died because he was an alcoholic and she refused to end up like her dad.

The treatment note that the ALJ likely referenced was Shockley's progress report of her video session with the plaintiff on June 17, 2020. The verbatim text of the relevant portion of the note is: "Disassociating (sic) a lot.

49

'Drank a sh*t tone (sic) last night.' Warned against this." Filing 18-3 at 103. At best, one could surmise that the plaintiff was dissociating to some extent on June 17, after having three alcoholic drinks the night before. However, it is not reasonable to causally associate the plaintiff's frequent reports of dissociating, as well as the many documented observations of the mental health professionals who are treating her, with drinking to excess as the ALJ concluded.

Finally, regarding the ALJ's finding about the effectiveness of the plaintiff's medication regime, the ALJ referenced Dr. Schmidt's treatment note dated September 15, 2020, (filing 18-3 at 113) in which the plaintiff told her that Abilify (aripiprazole) has been the best medication she has ever been on in that her auditory hallucinations and delusions were practically gone, with considerably less paranoia and PTSD. Filing 17-2 at 24. The ALJ accurately reported Dr. Schmidt's comments about the plaintiff on this occasion. However, Dr. Schmidt's observation, and the plaintiff's report of her symptoms on this one day, do not change what the longitudinal medical history shows.

On February 19, 2020, the plaintiff told Shockley she was having command auditory hallucinations, and had a visual hallucination of a demon fire man. Filing 18-3 at 22. Shockley called Dr. Schmidt to report the plaintiff's increased symptoms. On February 20, Dr. Schmidt called the plaintiff about Shockley's concerns, and the plaintiff told her that she had stopped taking her prescribed depression medication, duloxetine, because she was having difficulty swallowing the capsule. Filing 17-8 at 120. Dr. Schmidt ordered a trial of Abilify to replace duloxetine. Shockley's progress note dated March 8 indicated that the plaintiff actually began taking Abilify on March 6. Filing 18-3 at 18. After ordering the trial of Abilify in February, Dr. Schmidt would not see the plaintiff again until September.

Before starting her Abilify prescription, the plaintiff reported that she had experienced hearing voices from shadow people at least since leaving Afghanistan in 2014. She had also attempted suicide twice by overdosing on prescription medication. Filing 17-7 at 13. The January 3, 2019, Heartland Family Service intake assessment found her to be suffering from severe depression. Filing 17-7 at 13.

After starting on Abilify, the plaintiff continued to hear the shadow people, but there were occasions where she reported that they were quiet or not bothering her. For example, Shockley's May 12, 2020 progress note reported that the plaintiff said the voices had not been around for the last couple days. Filing 18-3 at 10. On June 10, Shockley reported that the plaintiff told her that there had been no voices for the past few days. Filing 18-3 at 7. On June 24, the plaintiff told Shockley that the negative male voice had not been so bad, filing 18-3 at 102, and on July 1, she told Shockley that the voices, for the most part, had been quiet, filing 18-3 at 101. On July 22, she told Shockley that the shadow people had been quiet, filing 18-3 at 98, and on July 29 she said that the shadow people were just background noise, filing 18-3 at 97. On September 9, just before her session with Dr. Schmidt, the plaintiff told Shockley that she hadn't seen or heard the shadow people since last week. Filing 18-4 at 8.

However, after telling Dr. Schmidt about how effective Abilify has been, the plaintiff's symptoms appeared to worsen. On September 29, Shockley reported that the plaintiff said the shadow people were really loud and that she dissociated a lot on her trip to North Carolina. Filing 18-4 at 6. On October 7, she told Shockley that the shadow people were talking again, including during the therapy session, that she was dissociating a lot, that she had two rage episodes, and had experienced sleep disturbances. Filing 18-4 at 5. At her

October 21 session with Shockley, the plaintiff said the shadow people were encouraging her to stay angry. Filing 18-4 at 3. She also said she would love to die, but that she's not suicidal.

From the plaintiff's perspective, Abilify may well have been the best medication she had been on, and relatively speaking, from her perspective her hallucinations with respect to the shadow people had decreased, and she likely did feel that her paranoia was considerably less and that her PTSD symptoms had lessened. But the record as a whole reflects that the plaintiff's report on this one day to Dr. Schmidt was another example of how the plaintiff's symptoms would wax and wane. This one report to Dr. Schmidt is not substantial evidence that the plaintiff's symptoms had been effectively controlled, or even stabilized, by the medication regime that had been prescribed.

Regarding the effectiveness of the psychotherapy and DBT, the ALJ concluded that the skills the plaintiff learned by participation in therapy benefited her by allowing her to ignore her hallucinations and delusions, and improved her activities of daily living. The record as a whole does not support the ALJ's conclusion. There are perhaps two occasions in the medical records where the plaintiff reported either ignoring, or trying to ignore, the voices and shadow people. *See* filing 18-3 at 23, 26. On other occasions, the plaintiff reported that the shadow people were quiet or leaving her alone. But for the majority of the time, the shadow people were present in the plaintiff's mind. This symptom, like many others, waxed and waned over the course of the plaintiff's treatment history. It was not a symptom that the plaintiff learned to control through psychotherapy or by employing the DBT skills that she had learned.

The same is true regarding improvements to the plaintiff's activities of daily living. The record as a whole contains several reports that the plaintiff had not showered for several days. Shockley reported that during a video session with the plaintiff on September 2, the plaintiff said that she didn't know how long it had been since she showered, and that there was a fly infestation in her house. Shockley reported observing hanging fly strips that were full of flies. Filing 18-4 at 9. Also, there are reports that the plaintiff had showered, or had dyed her hair, or had used makeup. The record as a whole shows that like her other symptoms, the plaintiff's capacity to take care of her activities of daily living varied widely from month-to-month.

In correlation with her analysis of the plaintiff's ability to take care of her activities of daily living, the ALJ concluded that the plaintiff's poor sleep was due, in part, to poor sleep habits. Filing 17-2 at 24. The evidence the ALJ relied on was therapy notes (without citation to the record) where her therapist purportedly reported that the plaintiff would stay up late watching television or being online. The record actually reflects that Shockley reported on September 2, 2020, that the plaintiff could not get to sleep, so she was up and online until 2:00 a.m., but still couldn't get to sleep after that until 6:00 a.m. Filing 18-4 at 9. The problem wasn't staying up late, it was not being able to get to sleep, so the plaintiff went online. That's not an issue with poor sleep habits: that's insomnia, for which Dr. Schmidt had prescribed trazodone. *See* filing 17-8 at 156.

Regarding whether the plaintiff was staying up late watching television, Shockley's progress note dated July 29, 2020, reported that the plaintiff was having sleep problems and was "Staying up too late. Keeps the tv on to keep the shadow people quiet." Filing 18-3 at 97. Thus, Shockley did not report that the plaintiff was staying up late watching television like the ALJ indicated.

53

The record as a whole shows that the plaintiff was diagnosed as suffering from insomnia and was being treated with prescription medication for her symptoms. Shockley's progress notes document several examples of the plaintiff's inability to sleep. For example, on October 17, 2019, the plaintiff reported that her sleep was poor. Filing 18-3 at 32. On December 12, 2019, she reported having a couple days of not sleeping at all. Filing 18-3 at 28. On March 11, 2020, she reported only getting 3 to 4 hours of sleep the other night. Filing 18-3 at 19. On May 12, 2020, the plaintiff reported only sleeping three hours. Filing 18-3 at 10. On June 24, 2020, she reported that she was not sleeping well. Filing 18-3 at 102. On August 5, 2020, the plaintiff reported getting nights and days mixed up. Filing 18-3 at 96. On October 26, 2020, the plaintiff reported problems with sleep and that she was awake until 6:00 a.m. Filing 18-4 at 2. Most of Shockley's progress notes do not mention the plaintiff's sleep, indicating that she wasn't having sleep problems on those occasions. Further, on one occasion, May 6, 2020, Shockley noted that the plaintiff reported that her sleep and sleep schedule were good. Filing 18-3 at 11. The record as a whole shows that the plaintiff's insomnia symptoms, like her other symptoms, waxed and waned throughout the relevant period.

Also in connection with the plaintiff's activities of daily living, the ALJ found that the plaintiff generally maintained consistent attendance at treatment visits over the relevant period, "which is a notable improvement in comparison to past attendance." Filing 17-2 at 24. The record as a whole supports the ALJ's finding, but this finding does not support the conclusion that the ALJ asserts. The ALJ used this finding to support her conclusion that the non-examining state psychologists' opinions were not persuasive regarding the plaintiff's limitations on persistence and pace. Filing 17-2 at 25. Both psychologists believed that the plaintiff would be moderately limited in

performing activities within a schedule, maintaining regular attendance, completing a normal workday or workweek without interruptions from psychologically based symptoms, and performing at a consistent pace. Filing 17-3 at 33, 42. The ALJ asserted that because the plaintiff maintained regular attendance with treatment, "there is no support for the conclusion that she would not be able to do the same in the course of full-time competitive employment. Filing 17-2 at 25.

The plaintiff's generally consistent attendance with psychotherapy treatment sessions does not approximate the conditions she would encounter in a competitive work environment. Shockley's sessions were generally once a week for forty-five minutes. *See* e.g., filing 18-3 at 8. A little over half of Shockley's sessions were by video or phone conference, which didn't require the plaintiff to leave her house. The plaintiff's sessions with Dr. Schmidt were every month to three months until her last visits, which were on February 27, 2020 and September 15, 2020. Dr. Schmidt's sessions generally lasted for thirty minutes, the last twenty minutes of which were devoted to supportive psychotherapy. *See*, e.g., filing 17-8 at 111.

A plaintiff's medical condition and the nature of life activities should be considered against the backdrop of the capacity to perform in the competitive labor market. *See Nowling*, 813 F.3d at 1122. A disability inquiry must focus on the claimant's ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005); *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc). Further, an ALJ must consider a claimant's ability to function outside a highly structured or supportive setting. *Nowling*, 813 F.3d at 1123; *Hutsell*, 259 F.3d at 711 (Individuals with chronic psychotic disorders commonly have their life

structured in ways to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms may indicate.)

Moreover, the ALJ did not give weight to direct evidence of the plaintiff's past work history. That evidence included the plaintiff's suicide gesture at her last job with the VA. Filing 17-8 at 89. The record also indicates that at her last job, the plaintiff used all of her allotted sick and annual leave, as well as 291 hours of family medical leave, before her employment ended. Filing 17-5 at 24-39. Finally, although the regulations provide that the Army's disability evaluation of the plaintiff is not binding on the ALJ, the regulations also provide that the ALJ will consider all of the supporting evidence that went into the Army's determination. 20 C.F.R. § 404.1504.

Here, the Army's disability determination is not only a disability determination by another governmental agency, but it is also a report or statement regarding the plaintiff's work history, which is a factor that an ALJ must consider when evaluating the plaintiff's subjective complaints. *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017). The Army found the plaintiff unable to perform her work responsibilities of supervising and providing guidance to junior grade soldiers

> due to her depressed mood; anxiety; suspiciousness; panic attacks more than once a week; chronic sleep impairment; mild memory loss, such a forgetting names, directions or recent events; impairments of short and long-term memory, for example, retention of only highly learned materials, while forgetting to complete tasks; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social

> relationships; difficulty in adapting to stressful circumstances, including work or a work-like setting; suicide ideations; impaired impulse control, such as unprovoked irritability with periods of violence; and intermittent inability to perform activities of daily living, including maintenance of minimal personal hygiene.

Filing 17-5 at 6.

Finally, the ALJ concluded that the plaintiff's allegations of disabling symptoms were "unsupported by objective evidence." Filing 17-2 at 24. "Objective medical evidence means signs, laboratory findings, or both." 20 C.F.R. § 404.1502(f).

> Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g. abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 404.1502(g).

The ALJ concluded that the plaintiff's mental exams showed, "limited abnormalities, most often noted as some mood disturbance, grooming and hygiene, and fair to minimally or moderately impaired insight and judgment." Filing 17-2 at 24. Also, the ALJ concluded that the plaintiff's allegations of disabling symptoms were contrary to certain factors noted to be unremarkable or within normal limits. Those factors included the plaintiff's "sensorium, cognitive functioning, thought process, memory, facial expressions, motor behavior, punctuality, attitude, and eye contact."

However, the ALJ fails to acknowledge that on each occasion that Dr. Schmidt or Shockley reported observing one or more of the ALJ's unremarkable factors, they also diagnosed the plaintiff as suffering from three serious mental health conditions, (1) major depressive disorder, recurrent, moderate, (2) PTSD, chronic, and (3) borderline personality disorder. *See, e.g.* filing 17-8 at 112. Also on each such occasion, supportive psychotherapy was provided to treat the symptoms associated with the plaintiff's diagnoses. Importantly, the unremarkable factors that the ALJ found relevant are not identified in the pertinent regulations as characteristic of, or as a sign or symptom of, the plaintiff's disorders.

For example, the regulations provide, in pertinent part, that depressive disorder is characterized by an irritable or depressed mood, or by a loss of interest in all or almost all activities causing a clinically significant decline in functioning. The signs and symptoms may include feelings of hopelessness, suicide ideation, sleep disturbances, a decrease in energy, disturbed concentration, sadness, and social withdrawal. 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.04(A). Trauma induced disorders such as PTSD are characterized by experiencing a traumatic event with the psychological aftermath of clinically significant effects on functioning. Signs and symptoms may include distressing memories, dreams, and flashbacks related to the trauma, diminished interest or participation in significant activities, persistent negative emotional state such as fear or anger, persistent inability to experience positive emotions, anxiety, and sleep disturbance. § 12.15(A).

The record as a whole is replete with descriptions of signs and symptoms that characterize the plaintiff's specific psychological abnormalities. The ALJ was wrong to conclude that the plaintiff's alleged disabling symptoms were not supported by objective medical evidence. In the context of a psychiatric

disorder, signs of a medically demonstrable phenomena indicating a specific psychological abnormality together with observable facts that can be medically described and evaluated constitutes objective medical evidence. Here, Dr. Schmidt and Shockley's evaluations and progress notes plainly and thoroughly document the plaintiff's specific psychological abnormalities, as well as observable facts which they medically described and evaluated.

The Court's detailed evaluation of the evidence that both supports and detracts from the ALJ's determinations does not allow it to conclude that the ALJ's determinations are supported by good reasons and substantial evidence. *Lawrence,* 970 F.3d at 994; *Boettcher,* 652 F.3d at 863. Specifically, the ALJ's determinations regarding the intensity, persistence and limiting effects of the plaintiff's symptoms are not supported by good reasons and substantial evidence. The ALJ's conclusions regarding the plaintiff's daily activities are either not entirely accurate or incomplete. The ALJ failed to consider evidence of the plaintiff's employability deficits such as her ongoing dissociations, hallucinations, delusions, and suicide ideations, as well as evidence in the record of her past job performance with the Army and VA. Good reasons and substantial evidence also do not support the significance of the evidence which the ALJ found supported her various determinations, such as equating the plaintiff's relatively consistent attendance at medical appointments with the capacity to engage in full time competitive work.

A disability determination is not an adversarial process, and the ALJ has a duty to fully and fairly develop the record supporting her determination. *Noerper v. Saul,* 964 F.3d 738, 747 (8th Cir. 2020); *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004). Here, for the reasons stated in detail above, the ALJ has not fully, or in fair context, supported her determinations.

59

2. PERSUASIVENESS OF THE PLAINTIFF'S TREATING PROVIDERS' OPINIONS

The ALJ found the opinions of Dr. Schmidt and Shockley,[3] the plaintiff's treating mental health providers, to be unpersuasive, principally because their opinions regarding the plaintiff's limitations were, in the ALJ's view, without support. Filing 17-2 at 25-26. A treating provider's opinion may well be entitled to great weight, but it does not automatically control since the record must be evaluated as a whole. *Pierce v. Kijakazi*, 22 F.4th 769, 772 (8th Cir. 2022). *See*, 20 C.F.R. § 404.1520c(a). Whether the ALJ gives the opinion of a treating provider great or little weight, the ALJ must provide good reasons for so doing. *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).

The regulations identify five factors to be evaluated when considering medical source opinions: (1) Supportability; (2) Consistency; (3) Relationship with the claimant; (4) Specialization; and (5) Other factors tending to support or contradict a medical source. § 404.1520c(c)(1)-(5). The most important factors are supportability and consistency, and an ALJ must explain the consideration given to both factors. § 404.1520c(b)(2). Supportability concerns the relevance of the objective medical evidence and explanations provided by the medical source in support of the source's opinions. § 404.1520c(c)(1). Consistency concerns the extent to which a medical opinion is consistent with evidence from other medical sources and nonmedical sources in the claim. § 404.1520c(c)(2).

The ALJ did not provide good reasons for rejecting the opinions of the plaintiff's treating mental health providers. The ALJ stated that both Dr.

---

[3] The ALJ noted that Shockley is not an "acceptable medical source" as defined in the regulations. 20 C.F.R. § 404.1502(a)(1)-(8). Shockley is, however, a source of highly relevant medical information. Regardless of Shockley's or any medical source's characterization, an ALJ is required to evaluate every medical opinion in evidence. 20 C.F.R. § 404.1520c(a).

Schmidt and Shockley provided their opinions on "a checkbox-style form provided by the claimant's representative," but that the real problem wasn't the form, it was the lack of support for the boxes checked. Filing 17-2 at 26. The form that Dr. Schmidt and Shockley completed is similar to the medical source statements the agency utilizes (see, e.g., Form HA-1152-U3) to obtain a medical source's opinion of a patient's ability to do sustained work. The form that the plaintiff's representative asked the providers to complete, however, is significantly more detailed than the agency's form, and seeks answers to very specific questions about a patient's mental health diagnosis, signs, and symptoms, in addition to the patient's capacity to do sustained work. *See*, e.g. filing 18-4 at 14-19.

Medical source statements are to be considered as a source of objective medical evidence. *Reed,* 399 F.3d at 921; *Burress,* 141 F.3d at 879. The plaintiff's medical providers were asked to check boxes identifying the signs and symptoms of the plaintiff's disorders. Among the boxes that both providers checked were ones which endorsed that the plaintiff has experienced, or was continuing to experience, delusions or hallucinations, depressed mood, diminished interest in almost all activities, sleep disturbance, decreased energy, thoughts of death or suicide, irritability, and detachment from social relationships. Filing 18-4 at 15, 22.

Dr. Schmidt and Shockley have consistently and repeatedly reported these very signs and symptoms in their treatment notes. It is true that Dr. Schmidt endorsed more signs and symptoms than Shockley, and it could be argued that some of those endorsed signs and symptoms are not reflected in her treatment notes. But that doesn't negate the fact that there is ample support in her treatment records for many, if not the vast majority, of the signs and symptoms she endorsed, as well as ample evidence showing that the vast

majority of Dr. Schmidt's endorsed signs and symptoms were consistent with Shockley's progress notes.

Further, both Dr. Schmidt and Shockley reported, in writing on the forms, clinical findings which supported, and were consistent with, the boxes they checked, as well as with the record as a whole. Dr. Schmidt listed the plaintiff's mood as "often depressed, while anxiety is overwhelming." Filing 18-4 at 21. Shockley listed the plaintiff's mood as labile. Filing 18-4 at 14. Shockley identified that the plaintiff's activities of daily living were poor. Both Dr. Schmidt and Shockley listed that the plaintiff experiences auditory and visual hallucinations or delusions. Dr. Schmidt added that the plaintiff's auditory hallucinations and delusions are "fairly well treated with Abilify." Both providers reported the plaintiff's prognosis as fair.

The forms asked the providers to rate the plaintiff, again in a checkbox format, regarding her mental abilities and the aptitudes needed to do unskilled work. Filing 18-4 at 16; 23. Both providers predominately rated the plaintiff in the "seriously limited" "unable to meet competitive standards" or "no useful ability to function" categories. Both providers rated the plaintiff's ability to maintain regular attendance and be punctual, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods, in the "unable to meet" or the "no useful ability" categories. The ALJ concluded that the providers had "no way of predicting such things within an acceptable degree of reliability." The ALJ thought the ratings were inconsistent with the plaintiff's generally consistent weekly attendance for Shockley's therapy sessions, and with the plaintiff's "relatively conservative treatment history." Filing 17-2 at 26

But, as noted above, generally consistent attendance for supportive psychotherapy sessions lasting no more than forty-five minutes, and mostly conducted remotely by video conference, is not substantial evidence, or even an indication of, the plaintiff's ability to perform full-time employment responsibilities, day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. *Reed*, 399 F.3d at 923. Neither can the plaintiff's treatment regime be fairly characterized as relatively conservative. Further, if the mental health professionals who have consistently treated the plaintiff for at least two years are unable to predict, "within an acceptable degree of reliability," their patient's capacity to work in a competitive environment on a sustained basis notwithstanding her documented mental health conditions, then who is?

In addition, both of the non-examining state agency mental health professionals also believed that the plaintiff's capacity to sustain concentration and persistence was limited due to her daily suicidal thoughts and because at times she will dissociate. Filing 17-3 at 33, 42. Both opined, in pertinent part, that the plaintiff would have moderate limitations maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, and completing a normal workday/workweek without interruption from psychologically based symptoms and performing at a consistent pace.

The ALJ found that the limitations Dr. Schmidt and Shockley endorsed were also inconsistent with the plaintiff's daily activities, the "unremarkable observations" and findings documented in her treatment notes and in her examination findings. Filing 17-2 at 26. As discussed in detail above, the ALJ's findings regarding the plaintiff's daily activities were incomplete, and the plaintiff's extensive and detailed treatment record concerning her frequent

reports of suicidal thoughts, as well as of the frequent confrontations with the shadow people, is hardly unremarkable.

The ALJ took issue with Shockley's opinions because they were only supported by the plaintiff's "subjective complaints." It is improper for an ALJ to discount a medical diagnosis or opinion based only on a plaintiff's recitation of events because a patient's report of complaints or history is an essential diagnostic tool. *Flanery v. Chater*, 112 F.3d at 346, 350 (8th Cir. 1997). An ALJ may discount, or even disregard, the opinions of treating medical providers where there are other better supported medical assessments, or more thorough medical evidence exists, or where a treating medical provider renders inconsistent opinions. *Nowling*, 813 F.3d at 1123. An ALJ's reasons for the weight afforded to a treating medical provider's opinion must be articulated with acknowledgement of the nature of the disorder at issue. *Id*.

Here, it was within the ALJ's discretion to discount Dr. Schmidt and Shockley's opinions that the plaintiff had no useful ability to function regarding, for example, her capacity to perform at a consistent pace, but it was contrary to all medical opinion, as well as the record as a whole, to completely reject the substantial evidence that there are limitations with plaintiff's capacity for sustained persistence and reasonably consistent attendance to participate in a competitive work setting. Not only were Dr. Schmidt's and Shockley's assessments of the plaintiff's conditions and capacities supported by and consistent with the record as a whole, as well as supported by and not inconsistent with the opinions of the non-examining agency psychologists, but as the plaintiff's treating mental health providers, both Dr. Schmidt and Shockley had extensive, specific knowledge of the plaintiff's condition due to their treatment relationship, and both were providing services, as well as their opinions, within the scope of their medical specializations.

64

When making hiring decisions, "employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs by hiring a person with serious physical or mental problems." *Hutsell*, 259 F.3d at 713; *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984). Here, the ALJ didn't just discount, but without good reason and contrary to substantial evidence, disregarded all medical opinion in the record, as well as the plaintiff's testimony, that she was limited in her capacity to perform basic work activities—full time, day in day out—in a competitive work environment. An ALJ may not simply draw her own inferences about a plaintiff's functional capacity or limitations from the medical reports. *Combs*, 878 F.3d at 646. Some medical evidence must support an ALJ's determination regarding the plaintiff's capacity to engage in competitive employment. *See Hutsell*, 259 F.3d at 712. Here, no medical evidence supports the ALJ's conclusion that the plaintiff is not limited in performing work activities on a consistent, full-time basis.

## III. CONCLUSION

The ALJ's denial of benefits is not supported by substantial evidence on the record as a whole. Specifically, the ALJ did not fully and accurately consider the evidence as a whole regarding the plaintiff's capacity to engage in full-time employment.

The ALJ's conclusions about the effectiveness of the plaintiff's medication and therapy regimes did not take into account the substantial evidence in the record as a whole that the plaintiff's symptoms varied considerably from week-to-week and month-to-month. Neither did the ALJ fully consider or represent the extent to which the plaintiff dissociates, and experiences auditory and visual hallucinations, as well as her capacity to

maintain activities of daily living, and the effects that the plaintiff's insomnia symptoms have on her capacity to maintain full-time competitive employment in the real world.

Further, the ALJ did not give weight to the substantial evidence of the plaintiff's employment history with the VA, including the evidence of the plaintiff's absences from work, her suicide attempt while at work, and the evaluation of her job performance at the VA found in the Army's disability evaluation. The ALJ also did not give weight to the unopposed opinions of the state agency psychologists and the plaintiff's treating mental health providers, all of whom opined that the plaintiff is limited to some degree regarding her capacity to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and complete a normal workday or workweek without interruption from her psychologically based symptoms.

When this evidence is considered together with the opinions of the vocational expert regarding work in the national economy for a person limited in their capacity to consistently maintain a work schedule, only one conclusion can be reached—the plaintiff is incapable of performing work, day in and day out, in the competitive real world where actual people work.

Here, the clear weight of the evidence fully supports a determination that the plaintiff is disabled within the meaning of the Social Security Act, and is entitled to benefits. *Pate-Fires v. Astrue,* 564 F.3d 935, 947 (8th Cir. 2009). Under these circumstances, a further hearing would merely delay benefits; accordingly, an order granting benefits is appropriate. *Hutsell*, 259 F.3d at 714; *Flanery*, 112 F.3d at 350.

IT IS ORDERED:

1.    The plaintiff's motion for reversal of the Commissioner's final decision (filing 22) is granted.

2.    The Commissioner's motion to affirm the Commissioner's final decision (filing 24) is denied.

3.    The Commissioner's decision is reversed.

4.    This matter is remanded back to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and an award of disability benefits consistent with this Court's Memorandum and Order.

5.    A separate judgment will be entered.

Dated this 8th day of March, 2022.

BY THE COURT:

John M. Gerrard
United States District Judge